UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF: | CASE NO. |
| **GEORGE L. BUSH, SR.** | **16-51481** |
| DEBTOR | CHAPTER 7 |
| **MARY MARGARET WOOD** | ADVERSARY NO. |
| PLAINTIFF | **17-6019** |
| VERSUS | |
| **GEORGE L. BUSH, SR.** | |
| DEFENDANT | |

## **MEMORANDUM OPINION**

Trial in the above-captioned adversary proceeding came before the Court on March 21, 2018.

At the conclusion of the trial, the Court took the matter under advisement.

### **I. Jurisdiction**

This is a core proceeding to determine the dischargeability of particular debts as well as an objection to discharge. Jurisdiction exists under 28 U.S.C. § 157(b)(2)(I) and 28 U.S.C. § 157(b)(2)(J) .

### **II. Facts**

George L. Bush, Sr. ("Bush") operated a night club known as Club Illusions for many years. The night club was located in a property he rented from Mary Margaret Wood's ("Wood") mother. Wood would collect rent from Bush from time to time.

When Hurricane Katrina hit the Gulf Coast, the night club was destroyed along with the property it occupied. Efforts to rebuild it were stymied by the City of Gulfport's denial of a permit. Wood also owned several rental properties and most were heavily damaged by Hurricane Katrina.

While waiting to reopen, Bush successfully performed construction supervision and repair work on approximately twelve to thirteen (12-13) of Wood's rental properties, bringing them all back into commerce.

In 2007, Wood owned a particular property with her cousins ("the Cousins") they referred to as Owen Square, a shopping center.  In 2007, Wood was called to a meeting by the Cousins for the purpose of discussing a buyout of their interests in Owen Square.  During the meeting, the Cousins proposed a sale of their interests to Wood if she would finance Bush's efforts to purchase and renovate a property located on 34th Street in Gulfport ("34th St.") for his night club.

Wood agreed.  She purchased the Cousins' undivided interests.  Wood began lending Bush funds for both his purchase of 34th St. and its renovation. In all, Bush executed fifteen (15) promissory notes from October 2007 to March 2012 ("Notes") with an outstanding aggregate principal balance of $1,091,835.00.

When Bush failed to repay the Notes, Wood filed suit against him in Mississippi State Court. On May 10, 2016, Wood received a judgment against Bush awarding her damages in the amount of $1,529,139.15, plus interest and attorney's fees ("Judgment").[1]

On August 30, 2016, Bush filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Mississippi. Bush was represented by John Gadow ("Gadow") and his law firm.

In the Schedules of Assets and Liabilities (the original Schedules of Assets and Liabilities are hereinafter referred to as "Schedule 1"), Bush claimed an ownership interest in a property located at 2420 Burke Street, Gulfport, Mississippi 39507 ("Bush's residence"), and indicated that Mr.

---

[1] Exh. 3.

2

George Bishop ("Bishop") held a lien against the property in the amount of $950,000.00.[2] Schedule 1 designated that this property was "business" property with an unknown current value.

Bush did not indicate any ownership interest in corporations, partnerships or other juridical entities on Schedule A. On Schedule 1, Bush declared monthly income of $1,625.00 from employment with his son at GB Detail Shop.[3] On his Statement of Financial Affairs (Bush's original Statement of Financial Affairs will hereinafter be referred to as "SOFA 1"), Bush outlined income received from his closely held company, Club Illusions, and gambling winnings:

| | |
|---|---|
| January 1 of current year until date of bankruptcy filing –income from operating a business | $0.00 |
| January 1 of current year until date of bankruptcy filing –income from wages, commissions, bonuses, and tips | $15,000.00[4] |
| January 1 to December 31, 2015 –income from operating a business | $513,734.00 |
| January 1 to December 31, 2014 –income from operating a business | $243,759.00 |
| January 1 to December 31, 2015 –income from gambling | $776,736.00[5] |

The United States Trustee ("UST") noticed a 2004 Examination of Bush. The examination uncovered several inconsistencies or inaccuracies in Bush's filing documents. Following the deposition, the UST demanded that the filing documents be amended to reflect:

---

[2] Exh. 15.

[3] *Id.*

[4] At trial, Bush testified that this $15,000.00 represented gross receipts from Club Illusions in 2016. No explanation was offered as to why Gadow selected the box "wages, commissions, bonuses, tips" instead of "operating a business."

[5] Exh. 15.

3

1. Bush's Ownership interest in Club Illusions;

2. Bush's firearm;

3. Bush's gambling winnings and losses for 2014, 2015, and year-to-date 2016;

4. Provide 2014 and 2015 tax returns;

5. Ensure gross income from employment, operation of a business, or any other sources of income for 2014, 2015, and 2016 year-to-date are correct;

6. Bush's liquor license;

7. Any losses from within one (1) year of bankruptcy filing;

8. Property held or controlled by Bush that belongs to another;

9. Disclose as income any funds Bush receives from friends or family to help him pay bills;

10. Any other income Bush receives;

11. Ensure all expenses are clearly listed on Schedule J; and

12. Ensure Bush's business connections are correctly listed.

Gadow filed an Amended Schedule of Assets and Liabilities ("Schedule 2") and Amended Statement of Financial Affairs ("SOFA 2") to revise Bush's original filings as follows:

1. Amended Schedule A/B as follows:

    a. Corrected description of 2420 Burke St., Gulfport, MS 39507 to reflect that the property is a "single-family home," not a "business property" as previously designated, and valued the property at $180,000.00.[6]

---

[6] Bush's testimony revealed that he has no ownership of Bush's residence, but rather, he rents the property from Floyd Smith. Bush explained this is why Schedule 1 lists the value as unknown and $0.00. Bush testified that he informed Gadow that he was renting, but this information was not correctly reflected on Schedule 1 or Schedule 2.

b. Disclosed ownership of 34th St. (location of Club Illusions), classified property as "other," and valued the property at $750,000.00.[7]

c. Disclosed Rutger Glock P85 firearm.

d. Disclosed checking account at M&M Bank with a $0.00 balance.

e. Disclosed liquor license and valued it at $0.00.

f. Disclosed claim against R. Kelly of an unknown value.

g. Corrected total real estate value to $930,000.00, instead of previously designated value of $0.00.

h. Corrected total of all property on Schedule A/B to reflect $948,500.00, instead of previously designated value of $18,350.00.

2. Amended Schedule I as follows:

a. Bush's description of employment from "Odd jobs working for son at GB Detail Shop" remained, but his gross wages were amended to reflect $0.00 monthly, instead of the previously disclosed $1,625.00 monthly.

b. Added $5,000.00 monthly income from Donna Roland ("Roland").

c. Revised combined monthly income to reflect $6,733.33 (sum of Bush's $5,000.00 income and Bush's fiance's income of $1,733.33) instead of the previously stated amount of $3,358.33 (sum of Bush's income of $1,625.00 and Bush's fiancé's income of $1,733.33).

3. Amended Schedule J Monthly Expenses as follows:

a. Increased rental or home ownership expenses for Bush's residence to $2,100.00.

b. Reduced home maintenance, repair, and upkeep expenses to $20.00.

c. Reduced food and housekeeping supplies to $500.00.

d. Reduced clothing, laundry, and dry cleaning expenses to $100.00.

---

[7] No amended Schedule D was filed to reflect that Bishop's lien is actually secured on 34th St., not on Bush's residence. *See* Exh. 21 and 22. Bush testified that Bishop financed the sale of 34th St. to Bush. Further, on January 4, 2017, during the pendency of Bush's Chapter 7 case, the stay was lifted as to 34th St.

e.  Reduced personal care products and services to $60.00.

f.  Reduced medical and dental expenses to $25.00.

g.  Added installment/lease payments for vehicle 1 of $900.00.[8]

h.  Added utilities for Bush's club in the amount of $2,000.00.

i.  Reflected total monthly expenses of $6,716.15.

j.  Reflected monthly net income as $17.18 (monthly expenses of $6,716.15 subtracted from combined monthly income of $6,733.33).

4.  Amended Statement of Financial Affairs as follows:

a.  Removed income from operating a business and income from wages, commissions, bonuses, and tips income from January 1 of current year (2016) until date of bankruptcy filing.

b.  Added income from gambling for January 1 to December 31, 2014 in the amount of $526,590.00.

c.  Added income from Rent/Royalty/Partners hip/Estate in the amount of $5,121.00 for an undisclosed year.

d.  Added legal action of *Gene White v. George Bush, Sr.* as a collection matter pending in an unknown court or agency.

e.  Added gambling losses as follows:

    i.  2016 cash/gambling losses of $15,141.99.

    ii.  2015 cash/gambling losses of $759,736.00.

    iii.  2014 cash/gambling losses of $526,590.00.

f.  Added checking accounts closed, sold, moved or transferred within 1 year of bankruptcy filing as follows:

---

[8] Bush's testimony revealed that at the time of filing, Bush leased a vehicle. This lease and vehicle were not disclosed on Schedule 1, but the vehicle was disclosed on Bush's SOFA 2, as property held by Bush that belongs to another.

    i.  Woodforest Bank checking account closed in August, 2016 with $0.00 as last balance.

    ii.  Regions Bank checking account closed around October, 2016 with $0.00 as last balance.

g.  Added 2009 Cadillac Escalade of $15,000.00 value belonging to "Rodney" as property Bush holds or controls that someone else owns.

h.  Unchecked box that within four (4) years before filing for bankruptcy that Bush owned or had a connection to a "sole proprietorship or self-employed in a trade, profession, or other activity, either full-time or part-time." The box designating ownership or a connection with a limited liability company or limited liability partnership remained checked on the amended filing.[9]

i.  Revised Bush's club's name to be "Club Illusions dba Club 34" instead of previously stated "Club Illusions." Added date of operation from October, 2013 to present.

j.  Added Kelly Baker, CPA as a party to whom within two (2) years of filing for bankruptcy that Bush gave a financial statement to about his business. Disclosed date issued October 2013 to present.[10]

(Together Schedule 1 and its amendment are collectively referred to as "Schedules" and the SOFA 1 and its amendment as "SOFA.").  Following the amendments, no further action was taken by the UST against Bush.

On April 14, 2017, Wood filed the instant Adversary Complaint ("Complaint") objecting to the dischargeability of Judgment under 11 U.S.C. §§ 523(a)(2) and (a)(4), or alternatively, requesting denial of Bush's discharge pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4), and (a)(5).

---

[9] At trial, Bush testified that his business was an S-corporation.

[10] Exh. 16 and Exh. 17.

7

### III. Law and Analysis

### A. Wood' s Claims Against Bush under 11 U.S.C. §§ 523(a)(2)(A) and (a)(4)

Wood contends that Judgment should be excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4). These two (2) subsections provide in pertinent part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
> 
> *         *         *
> 
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> > 
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> > > 
> > > *         *         *
> > 
> > (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny…

A creditor must establish by a preponderance of evidence the exception to dischargeability.[11]

### 1. Section 523(a)(2)(A)

To succeed under section 523(a)(2)(A), Wood must prove that she justifiably relied on a representation made by Bush that he knew to be false but gave with the intention to deceive. Wood's damages must also be proximate to the representation.[12] At trial, Wood's testimony failed to supply any evidence to support a claim of exception from discharge under this provision of section 523(a).

Wood recounted her prior business dealings with Bush through her mother and in the renovation of her rental properties, which included Wood's approximately ten (10) to twelve (12) residential properties and her one (1) to two (2) commercial properties. All of these interactions went successfully and without issue.

---

[11] *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991).

[12] *Matter of Selenberg*, 856 F.3d 393, 398 (5th Cir. 2017); *Field v. Mans*, 116 S.Ct. 437, 444 (1995).

Wood testified that the Cousins wanted to sell their interests in Owen Square. She believed they were considering an overture from an individual unknown by Wood and living out of state in Louisiana. She relayed that in 2007 the Cousins called her to a meeting. At the meeting they indicated a willingness to sell her their interests in Owen Square provided she agreed to lend Bush funds to purchase and renovate 34th St. Because Wood did not want to own Owen Square with a stranger, she agreed to finance Bush's venture in exchange for the right to buyout the Cousins' interests.

Wood financed Bush, and the Cousins sold their interests to her.[13]

Wood did not present any evidence that Bush obtained his loans as a result of any false pretense, false representation, or actual fraud. In fact, Wood offered nothing to indicate any representation by Bush made in connection with the Notes or otherwise.

Although the Cousins' interest in Bush is still unexplained, nothing in their demand reflects on Bush nor can it rise to the level of a misrepresentation, false pretense, or fraud. A demand was made for money and a promise to finance Bush in exchange for the sale of an undivided half interest in Owen Square. The Cousins were free to make any demand as consideration for their sale, and Wood was free to accept or reject the offer. More importantly, nothing in the record indicates Bush exerted any influence over Wood or committed any fraud.

With no evidence of a false pretense, false representation, or fraud, Wood has failed to carry her burden of proof. As such, at trial, this Court granted judgment in favor of Bush relative to Wood's claim under section 523(a)(2)(A).

---

[13]Exh. 20.

### 2. Section 523(a)(4)

Wood also argues that the debts owed to her by Bush are nondischargeable under section 523(a)(4).  Section 523(a)(4) requires the debtor commit a fraud or defalcation while acting in a fiduciary capacity; alternatively, embezzlement or larceny can form a basis for a claim of nondischargeability.

In *Texas Lottery Comm'n v. Tran (In re Tran),* 151 F.3d 339, 342-43 (5th Cir. 1998), the Court of Appeal for the Fifth Circuit found that the debtor must have occupied a fiduciary position involving an express or technical trust or a duty arising independently of any contractual obligation. The trust relationship must also predate the creation of the debt.[14] Wood offered no evidence of a fiduciary relationship with Bush. Her testimony describes an unremarkable debtor/creditor relationship.

To establish larceny, Wood must prove a fraudulent taking of property belonging to another with the intent to convert and permanently deprive it from the owner's use.[15]  While Wood initially described her discomfort in lending to Bush, her advances were clearly loans for which Bush executed Notes requiring repayment.  So as an initial matter, this transaction lacks proof of intent to permanently deprive Wood of her funds.  Further, while Wood alleged the Cousins pressured her to finance Bush, she was also clear that she elected to accept the terms of their demand in an effort to gain control over the property they owned in common.  Wood also testified that she wanted to help Bush start his business.

---

[14] *See also Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1338 (5th Cir. 1980).

[15] *Cowin v. Countrywide Home Loans, Inc. (In re Cowin)*, 864 F.3d 344, 350 (5th Cir. 2017).

As a result of the meeting with the Cousins, Wood purchased their undivided interests in property for a substantial sum and financed Bush's business endeavor. Nothing in this situation constitutes a taking much less a fraudulent conversion or larceny.

To establish embezzlement, Wood must prove that she entrusted her property to Bush; Bush appropriated the property for a use other than that for which it was entrusted; and the circumstances indicate fraud.[16]

Wood lent Bush money to purchase 34th St., renovate it, and open operations.  Once the funds were advanced, they were not Wood's property. Instead, the loan proceeds actually belonged to Bush. Wood might have argued that the funds were not used as required under the loan, but offered no evidence that the loans she made carried any restriction on their use.  Further, Wood offered no evidence as to how the loan proceeds were utilized. Wood has not only failed to establish that Bush converted property, she failed to establish even a misuse of funds.

In light of the lack of evidence presented at trial relative to Wood's section 523(a)(4) claim, this Court granted judgment in favor of Bush at trial.

### B. Wood's Claims Under 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4), and (a)(5)

11 U.S.C. § 727(a) dictates that courts "shall grant the debtor a discharge" provided that the debtor did not engage in any of the statutorily proscribed behaviors. Exceptions to a debtor's discharge are to be construed liberally in favor of debtors and strictly against creditors.[17]

---

[16]*Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602-3 (5th Cir. 1998) (quoting *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir. 1996)).

[17] *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 694-95 (5th Cir. 2009). *See also Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).

Wood's Complaint alleges that Bush "failed to satisfactorily explain the dissipation of in excess of two and a half million dollars in the four-year period prior to fling of the Petition and failed to preserve or maintain accurate financial records as would accurately reflect such disposition." Wood's Complaint also avers that Bush intentionally concealed and fraudulently conveyed material assets, specifically Club Illusions, in an effort to place such assets outside the reach of creditors.[18]

### 1. 11 U.S.C. § 727(a)(2)

Section 727(a)(2)(A) requires an objecting creditor prove: (1) a transfer or concealment of property; (2) belonging to the debtor; (3) made within one year of the bankruptcy filing; and (4) done with the intent to hinder, delay, or defraud a creditor of the estate.[19] Actual intent to defraud is required, which may be inferred from circumstantial evidence and the debtor's actions.[20] To evaluate actual intent for a section 727(a)(2)(A) claim, the Fifth Circuit employs a six (6) factor test:

(1) The lack or inadequacy of consideration;

(2) The family, friendship or close associate relationship between the parties;

(3) The retention of possession, benefit or use of the property in question;

(4) The financial condition of the party sought to be charged both before and after the transaction in question;

(5) The existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

---

[18]P-1, Complaint, pages 2-3.

[19]*Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005).

[20]*Id*.

12

(6) The general chronology of the events and transactions under inquiry.[21]

At trial, Wood alleged that Bush failed to disclose his ownership interest in Club Illusions, income from employment in 2016, and furniture, equipment, and fixtures located at 34th St. As a result of these lapses, Wood avers that Bush was hiding assets in an attempt to deny them from creditors.

### a. Ownership Interest in Club Illusions

The omission of a single asset can constitute actual intent to defraud and grounds for denial of discharge, particularly when the asset is material to a debtor's worth or could lead to the discovery of material assets relating to the debtor's business transactions or estate.[22]

A review of Schedule 1 and SOFA 1 reflects a failure to disclose Club Illusions on Schedule A under question nineteen (19) pertaining to interests in non-publicly traded stock and interests in corporations or limited liability companies; under question twenty-seven (27) relating to general intangibles; and under question thirty-seven (37) pertaining to any legal or equitable interests in any business related property.[23] However, on SOFA 1 question four (4), Bush disclosed gross receipts received from his ownership interest in and operation of Club Illusions, and Bush disclosed under question twenty-seven (27) that within four (4) years of his filing for bankruptcy, he owned or had a connection with Club Illusions, also including the business' employer identification number.[24] So

---

[21] *Pavy v. Chastant* (*In re Chastant*), 873 F.2d 89, 91 (5th Cir. 1989) (quoting *In re Schmit*, 71 B.R. 587, 590 (Bankr. D. Minn. 1987)).

[22] *Royer v. Smith (In re Smith)*, 278 B.R. 253, 258 (Bankr. M.D. Ga. 2001); *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992).

[23] Exh. 15.

[24] *Id.*

13

while his ownership in Club Illusions was missing from Schedule 1 it was disclosed, a bit imperfectly on SOFA 1.  The disclosure of his ownership interest on SOFA 1 mitigates his lapse on Schedule 1. Both documents were sworn by Bush under oath to be true and correct and simultaneously filed.  Even a cursory read of SOFA 1 alerted all to Bush's ownership in Club Illusions. Bush testified that he relied on Gadow to place the required information in all necessary places.

Gadow is no longer available, having died during the prosecution of this Adversary.[25] However, because Gadow prepared Schedule 1 and SOFA 1, he undeniably knew of Bush's ownership interest in Club Illusions. Why he failed to report that interest on Schedule A is unexplained, but his disclosure on SOFA 1 would not have alerted Bush to any problem. It is doubtful that a debtor would question where a stock interest was physically disclosed.  The Court finds Bush's testimony on this point to be credible and accepts his explanation that Gadow selected where and how his assets were disclosed. It is not too far a leap for this Court to believe that Bush relied on Gadow to properly fill out the schedules and other required filings for bankruptcy.[26]

---

[25] Blake Tyler ("Tyler"), a law partner with Gadow, testified in support of Bush.  However, his testimony offered no explanation as to why Gadow would have neglected to disclose an ownership interest in Club Illusions on Schedule A, particularly when it was disclosed on SOFA 1.

[26] Bush's counsel questioned Tyler to learn where Tyler's firm would have disclosed Bush's interest in Club Illusions on Bush's schedules. Tyler responded that the firm reports that type of information on the Statement of Financial Affairs, which is what occurred in Bush's case. Tyler further testified that it was his understanding that Club Illusions had "little if no value" and that the fixtures and other personal property inside the club did not belong to Bush. The Court notes that the practice employed by Tyler's firm in failing to disclose a closely held company on Schedule A is incorrect.  It should be disclosed on Schedule A and if profits are obtained from its operation, on the Statement of Financial Affairs. However misguided, this testimony does bolster the assertion by Bush that his failure to disclose his Club Illusions ownership on Schedule A was a mistake by counsel.
    Tyler also stated that it was his recollection that the fixtures and items inside Club Illusions belonged to third parties, such as Roland or CocaCola. Moreover, Tyler credibly testified that he could not identify any property that Bush concealed from the Court after his Schedules were amended.

Wood has not suggested that Gadow conspired with Bush to hide assets. In fact, Bush and Gadow did disclose substantial profits from Club Illusions in the years prior to Bush's filing. Bush's disclosure of profits, business name, and employer identification number from Club Illusions belies any intention to hide it from creditors.

Club Illusions was also of questionable value at the time Bush filed for relief. Prior to Bush's bankruptcy filing, Club Illusions had closed completely for three (3) months. Bush testified that the initial closure and subsequent reopening were then followed by a little over ten (10) months of no business. Club Illusions owned no property, real or personal, and Bush's interest in it did not lead to the discovery of any additional, relevant information.

Because this asset was of no value; it was disclosed, if not perfectly, in debtor's filings; and Gadow prepared Schedule 1 and SOFA 1, the Court finds that the evidence offered establishes the omission of Club Illusions from the Schedules was not knowing nor was it intended to hide assets from creditors.

### b. Furniture, Fixtures and Equipment

Wood also alleged that the assets, specifically the furniture, fixtures, and equipment ("FF&E") used by Club Illusions in its operations were intentionally omitted from Bush's Schedules. In fact, the FF&E was omitted because it was not owned by Bush. All personalty located at 34th St. was leased to Club Illusions by third parties. For this reason, the FF&E was properly omitted from Bush's Schedules and did not increase Club Illusions' net worth.

### c. Employment Income from 2016

Wood avers that the removal of income originally displayed on Schedule 1 constitutes an intent to defraud creditors. On Schedule 1, Bush disclosed $1,625.00 in monthly income from a job

15

he held with his son's company.[27] On Schedule 2, Gadow deleted this income.[28] Wood further complains that Bush's original disclosure of 2016 gross receipts from Club Illusions of $15,000.00 on SOFA 1 was inexplicably omitted from SOFA 2.[29] She argues that as a result of these failures, Bush attempted to hide income from his creditors.

Why Bush's income was deleted on Schedule 2 is unexplained.  What is clear is that Bush never denied earning the income from his job with his son, originally disclosed it, and testified under oath at his 2004 examination regarding his bankruptcy filing and income. All of this occurred prior to the preparation of Schedule 2. As a result, the Court concludes that the removal of Bush's income from employment on Schedule 2 was an error by Gadow.

As to Wood's allegation regarding Club Illusions' gross receipts deleted for 2016, Bush explained that when he filed, the tax returns for Club Illusions had not been prepared.  He estimated $15,000.00 in gross receipts for 2016. After the filing of Club Illusions' return, a loss was realized. As a result, the 2016 gross earnings of $15,000.00 were deleted from SOFA 2, while other year's gross receipts remained unchanged. It is inexplicable as to why Gadow deleted the 2016 gross receipts, while including gross receipts for the prior years. The Court finds that Gadow may have been confused when he discovered that Bush took a loss and earned no income from his business in 2016. However, Wood offered no contrary evidence to support a claim that Club Illusions was

---

[27] Exh. 15.

[28] Exh. 16.

[29] Exh. 15 and 17.

profitable in 2016.[30]   The Court finds that no omission or concealment occurred with respect to profits from Club Illusions.

### d. Gambling Losses and Profits

Wood complains that Bush's gambling winnings prove Bush was squandering assets. Bush testified that the original disclosures of gambling income were grossly overstated because they only included his winnings, not his losses.   As a result, SOFA 2 was filed to accurately reflect his gambling winnings and losses from 2014 and 2015, revealing little to no income from gambling for the years 2014-2015 and that Bush had sustained a gambling loss of $15,141.99 in 2016.[31]

Bush produced Win/Loss Statements to support his gambling winnings and losses.[32]   The statements were generated by The Hard Rock Casino and reflected net losses from gambling from 2012-2015.  Bush also testified that he amended his tax returns to reflect these results.  Wood offered nothing to refute this evidence. The Court concludes that Bush did not conceal income from gambling because he had none.

A review of Bush's Schedules and SOFA, as well as the testimony offered by Bush and Tyler[33] paint a picture of a confused and inexperienced attorney for the type of bankruptcy case

---

[30] The Court notes that the UST requested Bush's tax returns for 2014 and 2015, and Tyler testified that his firm satisfied the UST's requests and never heard back from the UST subsequent to the requests' satisfaction.

[31] Exh. 17.

[32] Exh. 18. The figures produced on the Win/Loss Statements are remarkably different from the figures placed on Bush's SOFA 1 and SOFA 2. Bush testified that he provided Gadow with his Win/Loss Statements and that he did not know where Gadow came up with the figures placed on his Schedules.

[33]Tyler testified as a member of Gadow's law firm. He acknowledged notes in Bush's file indicated a need to add more about Club Illusions. Tyler testified that "in the amended schedules, I'm just wondering why some of the...if these handwritten notes...if they did not make it on there...it just seems quite...that seems odd to me." Bush's counsel, on re-direct examination of Tyler, pointed out to Tyler that in Bush's Schedule 2 that Tyler's firm did disclose the address and value of the property upon which Bush operated his club. Later, Tyler's testimony revealed some confusion on behalf of Tyler's firm about the information provided by Bush, as Tyler's firm listed Bush's residence as property that secured Bishop's lien, when in reality, Bishop had a lien on 34th St., where Bush operated his

Bush's situation required. Bush appears to have disclosed all necessary information to counsel, but the Court concludes that Gadow's lack of knowledge and experience resulted in the discrepancies on Bush's Schedules. This finding is supported by the initial disclosure of information later deleted on Schedule 2 (2016 income earned from Club Illusions and employment income from working with son), partially disclosed information (ownership in Club Illusions contained in SOFA 1 but not Schedule A), and the original reporting of only gross gambling winnings.

There is no question that Bush's Schedules and SOFA were confusing, inaccurate, and incomplete in certain instances. However, it is in Bush's favor that each asset or source of income was actually disclosed. Based on the level of disclosure contained in Bush's Schedules and SOFA, the Court finds that creditors, particularly Wood, were not misled. If Bush had wanted to deceive, the disclosures would never have been made.[34]

### 2. 11 U.S.C. § 727(a)(3)

A discharge may be denied under section 727(a)(3) if a debtor conceals, destroys, mutilates, falsifies, or fails to preserve recorded information from which the debtor's financial condition or

---

business. Tyler's testimony revealed that the firm knew this information, but the Court notes that the proper information did not make it onto Bush's Schedules.

[34] This conclusion is supported by Bush's cooperation with the UST. When questions arose regarding the initial disclosures, Bush assisted his counsel and provided additional information or documentation. The Court takes note that Bush's supplementation satisfied the UST according to Tyler's testimony, and as the UST did not seek to participate in this adversary proceeding. The Court also finds that Bush was not a particularly sophisticated businessman, lacked basic understanding of the bankruptcy process and documentation, and based off of the testimony, did not appear to have received the most thorough or detail-oriented legal counsel at the outset of his bankruptcy case to properly advise and guide him through the process and the schedules.

Bush entrusted Gadow with the correct information and relied on him to properly place and maintain the correct information on all of his filings. The Court finds that the information provided was sufficient to apprise Wood of Bush's financial situation at the time of filing for bankruptcy relief. Moreover, Wood presented no specific evidence or testimony at trial in furtherance of her allegations in her Complaint of dissipation of income or that any alleged concealed asset was materially significant or might lead to significant assets. She also failed to establish that the Schedules or SOFA did not alert her to the existence of the very sources of income or assets she alleges were concealed.

18

business transactions might be ascertained.   While the Bankruptcy Code requires a debtor maintain written records of his financial condition, they do not have to be fully detailed.[35] The extent and detail of the records required is undefined under the Code. Courts may determine the adequacy of debtor's records by considering, on a case by case basis, factors such as the debtor's occupation, education, sophistication, experience, financial structure, and other circumstances a court feels necessary to consider in the interest of justice.[36]

Wood bears the initial burden of showing Bush failed to produce adequate records. To do so, she must establish that Bush's failure makes it impossible for her to ascertain Bush's financial condition. If Wood satisfies this burden, then Bush must prove that the inadequacy of records is justified under the circumstances.[37] Bankruptcy courts have "wide discretion" with respect to this determination.[38]

Wood's Complaint focuses on Bush's failure to explain the loss of "over $2,500,000.00" prior to filing.  She also complains that Bush gave conflicting information regarding income earned while working for his son.

Initially, Bush disclosed on SOFA 1 gross gambling income from 2015 of $776,736.00 in aggregate. On SOFA 2, Bush disclosed gross gambling income from 2015 of $776,736.00 and 2014

---

[35] *Judgment Factors, L.L.C. v. Packer (In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016) (citing *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003)) (quoting *Goff v. Russell Co. (In re Goff)*, 495 F.2d 199, 201 (5th Cir. 1974)).

[36]  *In re Duncan,* 562 F.3d 688, 697 (5th Cir. 2009).

[37]*Id.*

[38] *Graham Mortg. Co. v. Goff (In re Goff)*, 579 Fed.Appx. 240, 245 (5th Cir. 2014).

gross gambling income of $526,590.00.[39] As previously discussed, Bush produced Win/Loss statements from the years 2012-2015 which establish that Bush did not have any gambling winnings in those years given the gambling losses he sustained each year.[40]  The Court has already accepted that this evidence justified Bush's assertion that he did not in fact have any net winnings.

A debtor is not required to maintain a "win/loss" diary in order to be eligible for a discharge in bankruptcy.[41] Bush's fault does not exist because he failed to disclose winnings, but because he overstated his winnings, which he thereafter rectified with disclosures from third party generated accounting to accurately reduce the winnings in accordance with his losses.

In light of the testimony, documents submitted, arguments of counsel, and demeanor of Bush, the Court is satisfied that Bush has produced documents sufficient to explain his gambling winnings and losses. Wood has failed to establish that Bush's records are insufficient to explain Bush's gambling activities.

With regard to 2016 income, SOFA 1 reflected $15,000.00 in gross income from Bush's investment in Club Illusions.  Wood complains that the omission of $15,000.00 on SOFA 2 was not supported.[42] Bush testified that his CPA prepared his tax returns every year.  While no tax returns were offered into evidence, the UST requested Bush to produce his 2014 and 2015 tax returns, and Bush satisfied this request. The CPA prepared K-1's for Club Illusions to reflect any profits or losses earned  by it. Wood offered no evidence to indicate that the returns were inaccurate or that the IRS

---

[39] Exh. 15 and 17.

[40] Exh. 18.

[41] *In re Sauntry,* 390 B.R. 848, 856 (Bankr. E.D. Tex. 2008).

[42] Exh. 15 and 17.

had questioned their veracity.  Professionally prepared tax returns reflecting the operating income and expenses of a closely held company are sufficient in this case to explain Club Illusions' financial state because Wood offered no evidence to challenge the veracity of the returns.

Following the closure of Club Illusions, Bush began working for his son.  Bush provided Gadow with an estimate of his monthly income, $1,625.00.  This was reported on Schedule 1.[43] Bush offered no explanation as to why Gadow removed the income on Schedule 2. In any event, Wood does not indicate what records Bush should have maintained to establish his earnings in 2016 from his son.  As previously found, the existence of tax returns would reflect his earnings, and Wood has failed to offer any evidence as to why they should not be sufficient in establishing his income.

Finally, Wood alleges that Bush failed to explain the source of $5,000.00 in monthly income reflected on Schedule 2.[44]  Bush testified that these funds were actually loans, not income, advanced by Roland.  Bush explained that Roland was loaning him this money to help him pay his creditors. Bush testified that this had been explained to Gadow and that she should have been listed as a creditor. This circumstance is odd to say the least.

Roland was not listed as a creditor. Bush offered no explanation as to the terms of these loans. He also did not introduce any written evidence of the advances or any agreement between him and Roland. Presumably, Roland is available to testify, but neither party called her as a witness. Bush's tax return might shed light on the veracity of the opposing views, but it also was not offered into evidence.

---

[43] Exh. 15.

[44] Exh. 16.

Although Bush offered no written documentation to establish the loans from Roland, loans do not have to be evidenced by a writing. Presumably Bush's tax returns were available to Wood, and the examination of Roland was also something she could have required. Wood failed to offer any evidence to refute Bush's explanation, so Bush's testimony on this point is the only evidence in the record. As a result, while the Roland relationship is unusual, the Court cannot conclude that Bush maintained insufficient records of its existence.

### 3. 11 U.S.C. § 727(a)(4)(A)

Wood argues that Bush's discharge should be denied pursuant to section 727(a)(4)(A). To succeed with her claim, Wood must prove that: (1) Bush made a materially false statement under oath; (2) with fraudulent intent; and (3) knew the statement was false. Fraudulent intent may be shown by reckless indifference to the truth.[45]

Wood cites *In re Beaubouef*, 966 F.2d 174, 178-9 (5th Cir. 1992), to support her claim. In *Beaubouef,* several material falsehoods or omissions relating to the debtor's estate were uncovered. The discrepancies could have revealed the existence of additional assets or explained some assets' dissipation. In addition, the debtor failed to amend his schedules to clarify the oversights. The Fifth Circuit found that the aggregate effect of the discrepancies in combination with a failure to amend amounted to a reckless indifference of the truth warranting denial of discharge. However, the *Beaubouef* Court also affirmed that a discharge should not be denied when the debtor omits items from his schedules by an honest mistake.[46]

---

[45] *Sholdra v. Chilmark Fin. L.L.P. (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001).

[46] *Id.* at 178.

22

In this case, Bush disclosed every asset or source of income that Wood complains were omitted. Although the disclosures were subject to revision, the fact remains that every asset Bush owned was disclosed, and his gambling income was actually overstated. Amendment to the filings corrected the overstatements but failed to disclose Bush's closely held business in every applicable place. Nevertheless, the Schedules and SOFA provided both Wood and the UST with sufficient information to clarify these errors.

In *Royer v. Smith (In re Smith)*, 278 B.R. 253, 259 (Bankr. M.D. Ga. 2001), the Bankruptcy Court found that the debtor's schedules omitted various worthless items. The Court also found that the debtor was not adequately questioned by his attorney, and that the debtor's reliance on his attorney together with other evidence demonstrated a lack of fraudulent intent. This Court is satisfied that Bush relied on his attorney to guide him through the schedules and place the information he provided on the appropriate places.

The Fifth Circuit held in *In re Duncan*, 562 F.3d 688, 696 (5th Cir. 2009) that debtor cooperation with creditors in identifying additional information may evidence a lack of fraudulent intent, and where the debtor satisfies the court with explanations of an omission, the creditor fails to satisfy the requirements of section 727(a)(4)(A) for a discharge denial. Based on the testimony of Bush regarding his efforts to provide the requested information to Gadow, coupled with his former counsel's apparent ineptitude, this Court does not find that fraudulent intent or reckless indifference to the truth exists.

### 4. 11 U.S.C. § 727(a)(5)

Finally, Wood argues that Bush should be denied his discharge under section 727(a)(5) for failing to satisfactorily explain the loss or deficiency of assets that would have helped Bush satisfy

23

his liabilities. The moving creditor bears the initial burden of proving that the debtor previously possessed substantial assets that are now no longer available for distribution to creditors.[47] After the creditor establishes that unavailable assets exist to satisfy claims, the debtor has the burden of providing a satisfactory explanation.[48] With reference to the word "satisfactorily" in section 727(a)(5), the Fifth Circuit has stated,

> [T]he word "satisfactorily"...may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation–he believes what the bankrupts say with reference to the disappearance or shortage. He is satisfied. He no longer wonders. He is contented.[49]

*In re Caletri*, 517 B.R. 655, 671 (Bankr. E.D. La. 2014), held that section 727(a)(5) does not require fraudulent intent. Debtors must offer an explanation to the court for the loss or deficiency of assets that displays "good faith and businesslike conduct."[50]  However, an objecting creditor may not simply rely on an allegation of lack of adequate explanation for lost assets to establish a *prima facie case* but must sufficiently establish and prove what are the "missing" assets.[51] The Court in *In re Wo*, 1991 WL 329579, at *2 (S.D.Tex.1991), found that a debtor's explanation that his cash assets were lost to gambling will not suffice as a satisfactory explanation where the debtor produced no

---

[47]*Chu v. Texas (In re Chu)*, 679 Fed.Appx. 316, 319 (5th Cir. 2017).

[48]*Id.*

[49] *In re Orsini*, 289 Fed.Appx. 714, 720 (5th Cir. 2008)(quoting *First Tex. Sav. Ass'n, Inc. v. Reed (In re Reed )*, 700 F.2d 986, 993 (5th Cir.1983)).

[50]*Id.*

[51]*In re Sanders*, 128 B.R. 963, 974 (Bankr.W.D.La. 1991).

evidence documenting, corroborating, or substantiating the gambling losses as such an explanation is vague and unsupported.

In this case, Wood argues that Bush dissipated over $2,500,000.00 in income. Wood has failed to provide any evidence of assets or income dissipated prior to filing. In fact, the only income lost are the gambling winnings Bush disclosed on SOFA 1 and SOFA 2. As this Court has already found, those winnings were overstated and corrected to amounts reflected on Bush's Win/Loss Statements.

Wood also argues that gambling losses indicate that Bush had income to lose prior to his filing for bankruptcy.[52] Her counsel maintained that loss of income through gambling was a moral failing worthy of discharge denial. This, in Wood's mind, constitutes an unsatisfactory explanation for dissipation of assets.

With regard to the income spent gambling, Wood failed to prove that any unreported income was omitted by Bush on his Schedules and SOFA. The Court resolutely rejects her argument that gambling away income was a moral turpitude worthy of discharge denial. The Bankruptcy Code does not have a morality clause. Bankruptcy relief is available to the unfortunate whether their financial condition is as a result of fault or events beyond their control. Debtors ask for relief after casualties, medical calamities, divorce, loss of jobs or businesses, and drug, alcohol, gambling, or even shopping addictions. The cause of a debtor's failure is not judged. What is required is an honest disclosure of assets, income, and liabilities. Wood has failed to establish that Bush breached this

---

[52] Bush explained that the gambling records do not reflect his wins and losses that result from "free plays" provided to him by the casino. Bush elaborated that he used "free play" money from the casino and some of his own money to gamble. Bush gave the example that he would receive $500.00 in "free play" money by putting $10.00- $30.00 of his own money into the casino machine. Bush testified that he would get $500.00 in "free play" money sometimes as often as every other day.

duty.

### IV. Conclusion

The Court granted verdict in favor of Bush at trial on the 11 U.S.C. §§ 523(a)(2) and (a)(4) claims. Wood failed to present any evidence establishing the requirements of section 523(a)(2) and (a)(4) and to prove by a preponderance of evidence that the obligations owed to Wood should be excepted from Bush's discharge pursuant to section 523(a)(2) and (a)(4).

For the foregoing reasons above, this Court will not deny Bush his discharge pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4), and (a)(5) in light of the testimony and evidence presented at trial. The Court will enter a Judgment in accordance with this Memorandum Opinion.

New Orleans, Louisiana, May 16, 2018.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge